CRICHTON *v.* HALLIBURTON & MOORE.

(Division B. May 26, 1929. Suggestion of Error Overruled June 7, 1929.)

[122 So. 200. No. 27853.]

266

*Wells, Stevens & Jones,* of Jackson, and *Boone & Lowrey,* of Marks, for appellant.

*Shands, Elmore & Causey,* of Cleveland, for appellees.

Argued orally by *J. M. Stevens*, for appellant, and *Hugh F. Causey*, for appellees.

ETHRIDGE, P. J., delivered the opinion of the court.

Halliburton & Moore were partners in the real estate business, and early in 1923 they took up with Mrs. Minna Lombard Crichton the matter of selling a plantation. After negotiations, they secured one John W. Miller as a purchaser of the plantation aforesaid, the purchase being made almost entirely on credit. The contract between Mrs. Crichton and Miller was signed on the 27th day of March, 1923, and reads as follows:

"Received of John W. Miller, the sum of ten dollars ($10) as earnest money in part payment for the purchase of the following described real-estate, situated in the county of Quitman and state of Mississippi, to-wit, one thousand four hundred fifty-three acres being the plantation purchased by Birdsong & Cox from Mrs. Lombard and leased by Birdsong & Cox to said John W. Miller, a more particular description of which land is waived in the contract, which I have this day sold and agreed to convey to John W. Miller or any other person he may

name for the sum of one hundred and nine thousand dollars, terms as follows:

"Two notes for two thousand five hundred dollars each due November 15, 1923, with interest at the rate of six per cent per annum; one note for the interest, at the rate of six percent from date of deed to January 1, 1924, on one hundred four thousand dollars; four notes of two thousand five hundred dollars each, and due on January 1, 1925, 1926, 1927 and 1928, respectively; nine notes for five thousand dollars each due on January 1st, 1929, 1930, 1931, 1932, 1933, 1934, 1935, 1936 and 1937, respectively; and one last note for forty-nine thousand dollars due January 1, 1938, all bearing interest from January 1, 1924 at the rate of six per cent per annum, payable annually on each January 1st, all notes made payable 'on or before' and secured by a trust deed on land to be conveyed upon presentation of a good and valid warranty deed, after a satisfactory proof of a good title is made.

"To secure the payments falling due up to and including January 1, 1924, and the taxes for 1923, said John W. Miller, agrees to give a trust deed on the fifty (50) bales of cotton to be the first picked from the land.

"It is understood and agreed that if the title is not good and cannot be made good within sixty days after written notice that title is defective, then this earnest money is to be paid back to John W. Miller, or order; but if the title is or can be made good and the property not taken, this earnest money is to be forfeited. It is expressly understood and agreed, however, by both parties to this contract, that such forfeiture shall in no way affect the rights of either party 'to enforce the specific performance of this contract.

"It is understood by the parties to this contract that there is a note of about fourteen thousand dollars with interest, outstanding secured by a deed of trust against these lands, and which note is due January 8, 1924. The

said Mrs. Powell Crichton binds herself to protect the said John W. Miller against any demands for payment of this note, but the said John W. Miller agrees that same may be paid in part, or may be extended twenty-four (24) months from date of its maturity at the pleasure of Mrs. Powell Crichton. To secure the said John W. Miller against the lien of this note, the notes to be given by him, due January 1, 1926, 1927, 1928, 1929 and 1930, respectively, shall be put in escrow to secure the payment of said fourteen thousand dollar note.

"The delivery of a deed under this contract to John W. Miller is subject to the following conditions: The title to these lands is vested in Birdsong & Cox. To divest them of this title and to vest it in Mrs. Powell Crichton —the owner and holder of the notes of Birdsong & Cox given as part payment for the purchase of these lands— either a compromise settlement must be made between Birdsong & Cox and Mrs. Powell Crichton by which they give her a deed to the land and she cancels the mortgage securing the said notes or she will foreclose on this mortgage and by this procedure acquire title to said lands. It is understood by the parties hereto that the said Mrs. Powell Crichton must acquire a title to said land before she is able under this contract to sell to said John W. Miller, but said Mrs. Powell Crichton must acquire title by one or the other of these methods and in case she elects to foreclose on said mortgage of Birdsong & Cox, she must begin under the terms of the trust deed securing the notes at once, after the signing of this contract. In like manner if she elects to compromise a settlement and take deed back from Birdsong & Cox, she must do this in reasonable time. All this is to say that Mrs. Powell Crichton must act in good faith in her procedure to acquire a title to this land for the purpose of carrying out the sale of this land to John W. Miller. The said Mrs. Powell Crichton reserves the right not to bid in excess of the amount of the notes owing her by Birdsong

& Cox at the time of the foreclosure sale, and if anyone should bid more than said amount, and thereby acquire title to said property in the foreclosure sale, in that event this contract shall become null and void, and have no effect.''

As this purchase was almost entirely upon credit, and Miller was a lessee of the property involved in the sale, in procuring the contract it was agreed between Mrs. Crichton and Halliburton & Moore, the agents who conducted the negotiations for her, that they would take two notes for two thousand five hundred dollars each, due November 15, 1923, as their compensation, without recourse upon Mrs. Crichton. This contract reads as follows:

''To compensate the firm of Halliburton & Moore, real estate dealers, for selling my plantation, in Quitman county, Mississippi, to John W. Miller, as evidenced by a contract of sale dated March 28, 1923, I hereby agree to transfer to them the two notes of two thousand five hundred dollars each due November 15, 1923, which transfer is to be made on the back of each note in substance as follows, to-wit:

''For value received I hereby transfer all right, title and interest in the within note, provided that such transfer is made upon the express understanding that the lien of the trust deed in said note referred to shall, as to this note, be subject and subordinate to the lien of said trust deed to secure all the other notes (these may be or may not be described) secured by this trust deed, and the rights of the holder of the within note shall always be, as to said trust deed, subject to the superior rights of the legal owner or holders of said notes above described.

''This transfer is made to Halliburton & Moore without recourse.

"MRS. POWELL CRICHTON.''

''I further agree that any balance over five thousand dollars derived from the sale of the fifty bales of cotton

mentioned in said contract may next apply on the payment of one of the two thousand five hundred dollar notes referred to above.

"MINNA LOMBARD CRICHTON.

"(MRS. POWELL CRICHTON)

"We accept the above settlement as full payment for our commission in the sale above referred to.

"HALLIBURTON & MOORE,

"By W. HALLIBURTON."

The complainants alleged that they performed all of the conditions and duties resting upon them in the contract, and the contract was breached, and failed of consummation because of the failure of Mrs. Crichton to comply with the provisions of the contract above set forth between herself and Miller.

The allegations of the bill were practically all denied by the answer, and these allegations above set out were denied.

On the 31st of March, 1927, Halliburton, of the firm of Halliburton & Moore, in returning the contract above set out, between Halliburton & Moore and Mrs. Crichton, among other things, says: "We note sale under Birdsong & Cox trust deed will take place April 14, 1923. We will keep our minds centered on the deal until it is completed."

On April 14th the sale under the deed of trust from Birdsong & Cox to Mrs. Crichton took place, and was bought in by Mrs. Crichton.

Under date of April 19th, Powell Crichton, the husband of Mrs. Crichton, wrote Halliburton & Moore, in reply to a letter from them to Mrs. Crichton, that the property had been sold under a deed of trust on April 14th, and purchased by his wife, and that the deed would shortly be recorded; that his wife could not find any abstract of title to this property, and that Mr. Cutrer, their lawyer, could not find it; that it was a natural presumption to think that Birdsong & Cox had the abstract, and requested

them to have Miller, the purchaser, ask Birdsong & Cox about the abstract.

On April 27th Powell Crichton, the husband, further wrote Halliburton & Moore that Mr. Cutrer, of Clarksdale, Mississippi, had abstracts, and that he had procured them from Birdsong & Cox, and that Halliburton & Moore could write to Mr. Cutrer for these abstracts if they desired them.

On May 10th Mr. Halliburton, of Halliburton & Moore, wrote Mr. Crichton that the abstracts had been sent to them, and they had turned them over to Mr. Miller; and they presumed there would be no difficulty in the title, suggesting in the letter that Mr. Crichton get a local lawyer to assist in the preparation of the various papers needed to consummate the deal; that Miller's attorneys would draw a warranty deed, and the same should be handed to some one representing Mrs. Crichton. In conclusion he said: "We shall keep behind Mr. Miller and his attorneys, that this deal may be closed in as short a time as possible."

Mr. Crichton replied to this letter that if they would send him a copy of the proposed deed, he would prepare the deed of trust for Miller to sign, in which the notes would be listed; that he was a lawyer, and could prepare the papers; that he had had considerable real estate experience, etc. He said, further, that Mrs. Crichton would arrive in Memphis on the Saturday following, and would call them on the telephone if she had time, and if not would call from Clarksdale; that his wife did not care to incur large attorneys' fees in Mississippi or in Memphis.

On July 10th, Mr. Halliburton, of the said firm, wrote Mrs. Crichton that they had just received the opinion of the attorneys in Mississippi representing Miller, who had made several objections, but from a careful reading of the opinion they, Halliburton & Moore, were not inclined to attach much importance to most of these objections,

but that Mrs. Crichton should have a lawyer to represent her. This letter also contained information with reference to the various objections raised by the attorneys of Miller, inclosing an opinion from them setting forth their criticisms of the title, and certain corrections that should be made.

About the time that Mrs. Crichton received this letter, in which was inclosed the letter from Miller's attorney to him, Mr. O. G. Johnson, an attorney from Clarksdale, Mississippi, but not then in the active practice, being at the head of a banking institution at that place, was in New York, where Mrs. Crichton lived, and was a guest in her home.

Some time prior to this, Mr. J. C. Cutrer, of the firm of Cutrer & Cutrer, was drowned, and J. W. Cutrer, the senior member of the firm, and father of J. C. Cutrer, was greatly distressed and made ill by the tragic death of his son; so that Mrs. Crichton thought it probable that he would be unable to attend to the matter properly within the time limit, and asked Mr. Johnson (a friend of hers, she having formerly lived in Mississippi) to look after the perfecting of the title for her. Mr. Johnson undertook to meet the requirements of the attorneys for Mr. Miller, and certain instruments were put of record in the county where the land lay, as required by the opinion of the attorneys of Miller.

It further appeared that the parties through whom Mrs. Crichton's mother acquired the land (Mrs. Crichton having come into possession of it through her mother's will) cast some doubt upon the title. One of the children of the former owner was *non compos mentis,* and the deed to Mrs. Lombard, the mother of Mrs. Crichton, was signed by the guardian of this *non compos mentis,* and by all the other heirs of the deceased former owner. This constituted the principal trouble in perfecting the title to the land.

Mr. Johnson got in correspondence with the guardian of this *non compos mentis* child, and learned from him that the child had died in 1917 without having married and with no children, and still insane. Consequently, her estate in the land, if any, went to her brothers and sisters, who had signed the deed to Mrs. Lombard; and as they had previously signed the deed, it inured to the benefit of Mrs. Lombard.

Mr. Johnson procured affidavits to this effect, and notified Halliburton & Moore of this fact, which they seemed to think would clear up the title.

On the 13th of August, 1923, Mrs. Crichton and Mr. Johnson were in Memphis, and went to the office of Halliburton & Moore and discussed the matter with them. Mr. Johnson proposed to mail the papers to Mr. Miller for signature, and to return the abstracts with the information and corrections which he had procured to be made to him for approval. Halliburton & Moore stated that Mr. Miller lived in the country, and there would probably be some delay if the papers were mailed to him; but that he was frequently in Memphis, and they would take the notes and deed of trust which had been prepared by Mr. Johnson, have Mr. Miller sign them, and return the abstract of title with the data perfecting the title, to Mr. Miller or to his attorney, and have the notes and deed of trust signed; and that he would notify Mrs. Crichton if there was any trouble in reference thereto.

Mr. Johnson was not certain whether Mrs. Crichton prepared a deed and left it with Halliburton & Moore, or whether she carried the deed to New York, to be examined by her husband; but no such deed was found in her papers, although it had been prepared; and no deed is shown to have been signed and acknowledged by Mrs. Crichton.

Mr. Miller testified that Halliburton & Moore presented the notes and deed of trust to him, but seemed to be of the opinion that this was done only at one time, and that

before the opinion on the abstract of title was rendered by his attorneys; at which time he declined to sign the notes and deed of trust, because a good title had not been shown to exist, or one that his attorneys would approve.

The attorney of Miller who examined the abstract and made the criticisms of it, testified that it was his recollection that after this letter was written in July, the abstracts and data obtained by Mr. Johnson were never returned to him, and that he had no further connection with the matter.

There is nothing to show that Halliburton & Moore ever informed Mrs. Crichton of any further action that was deemed necessary to correct the title, or to perfect it. Nothing, indeed, is shown to have passed between Halliburton & Moore and Mrs. Crichton up to the time of her death on August 25th, after a brief illness, and before the expiration of the sixty days allowed her to perfect the title after the examination of same, should any further action be needed to make it a merchantable title.

After Mrs. Crichton's death, Halliburton & Moore wrote Mr. Crichton, the husband of Mrs. Crichton, who was also executor of her last will and testament, and the principal beneficiary therein, that they thought. Miller was going to back out of the deal if there was any chance for him to do so, and that their interest in the deal must be protected. They gave it as their opinion that he would back out because of unsatisfactory crop and labor conditions existing at the time.

After the death of Mrs. Crichton, Powell Crichton qualified as executor, and had the will of his wife probated in Quitman county, Mississippi; and thereupon filed a suit to specifically enforce the contract as against Miller. This suit was not filed immediately after the death of Mrs. Crichton, but early in the year 1924.

No notes or deed of trust were ever signed by Miller. He decided not to carry out the contract and take the

place, declaring that this was due to the fact that the title was not shown to be good; and he purchased other property.

Miller became involved in a transaction in Arkansas, and in 1924 he was sued in that state, being served while there on a visit, and was sick at the time the court convened, and did not attend such court, and a large judgment was taken against him by default. Miller deemed it necessary in order to escape this judgment, to go into bankruptcy, not having sufficient property to pay all obligations against him, because of this large judgment.

In the fall of 1924, this condition then existing, Powell Crichton, the executor, dismissed the said suit for specific performance, and the suit against him was filed by Halliburton & Moore, for their commission, or, rather, for the value of the notes which they would have secured for their services had the deal been consummated.

When their bill was first filed, a demurrer thereto was filed, which demurrer was sustained by the chancery court. An appeal was taken to this court, where the judgment sustaining the demurrer was reversed, and the cause remanded; the former opinion being reported in 147 Miss. 621, 111 So. 743.

On the hearing on the facts, as stated hereinbefore, the chancellor found for Halliburton & Moore. It appears, from a statement by the chancellor in the record, that it was his idea that the complainants, Halliburton & Moore, were entitled to recover because they had procured a contract to be signed by Mrs. Crichton and Mr. Miller, and that anything done after the signature of this contract and this delivery was immaterial, under the court's former opinion; and if the deed was not executed or tendered, and an acceptable title, or a marketable title, tendered, that the complainants were entitled to judgment. Upon this point the court said: "As I understand the issue in this case after a new decision of the supreme court, it really does not make any differ-

ence what Mrs. Crichton and Mr. Miller did or refused to do after they were brought together under their contract, and they were validly bound by that contract and mutually obligated to each other with reference to the sale of land, a contract that could be enforced by either of the parties, that the complainant in the case would not be concerned with what either of them did or failed to do after that time, and I understand that it is the holding of the supreme court on the former hearing of this case.''

The case was here formerly on bill and demurrer, and there was nothing in the bill to show any transaction between Mrs. Crichton and Halliburton & Moore to have taken place on the 13th of August.

It may be that Halliburton & Moore were entitled to their commission, or to the value of the notes which they were to receive as compensation for their services in the matter, if they had stood upon their rights as they existed at that time, and had not undertaken any further obligation with reference to the deal. It is not necessary now to decide whether they would have been in this favorable position or not. But when they induced Mrs. Crichton and her attorney to intrust them with the notes and deed of trust and the abstract of title, to be presented to Mr. Miller and his attorney for approval, they changed their *status,* and were then under duty in good faith to do what they undertook to do in this agreement with Mrs. Crichton and her attorney. Neither Halliburton nor Moore testified, and under the statutes were incompetent to testify as witnesses, as to transactions and understandings between them and Mrs. Crichton which would tend to make out their claim against her estate.

Considerable correspondence was introduced into the record, and it is presumed that all of the correspondence between Halliburton & Moore and Mrs. Crichton was

introduced which had any bearing upon the questions involved. Mrs. Crichton was a resident of New York, and, as stated above, died a short time after Halliburton & Moore agreed with her to procure the signatures to the notes and deed of trust, and to present the abstract of title to Miller or his attorney for approval or further criticism.

The testimony upon that point introduced by the witnesses Miller and Holmes tended to show that Halliburton & Moore did not, in fact, present this abstract of title, with the data obtained by Mr. Johnson, correcting or perfecting it as he thought, to the attorney for Miller who had prepared the original opinion for the latter, for any further examination or opinion.

We think it was incumbent upon them in good faith to present this data and perfected abstract to the attorney who prepared the objections, or to some other attorney selected by Mr. Miller, and it was incumbent upon them, as complainants, to refute the testimony of Mr. Johnson by some competent testimony, or to show affirmatively that they complied with the agreement therein made on the 13th of August in reference to this matter.

It is argued by the appellees that the chancellor passed upon the whole matter, and that his judgment carries with it a finding of facts necessary to support the judgment, and that the chancellor's finding of fact could not be overturned by this court. This argument is strongly presented, and a striking quotation from some unnamed judge set forth to show the strength of this rule. Counsel say:

"As an eminent judge once said:

" 'The courts are fond of saying that deference should be given to the trial chancellor. He sees and hears much, that the appellate court cannot see and hear. We well know there are things of pith that cannot be preserved in or shown by the written page. Truth does not always stalk boldly forth naked but modest withal, in a printed

abstract in a court of last resort. She oft hides in nooks and crannies visible only to the mind's eye of the judge who tries the case. To him appears the furtive glance, the blush of conscious shame, the hesitation, the sincere or the flippant or sneering tone, the heat, the calmness, the yawn, the sigh, the candor or lack of it, the scant or full realization of the solemnity of an oath, the carriage and mien. The brazen face of the liar, the glibness of the schooled witness in reciting a lesson, or the itching over-eagerness of the swift witness, as well as the honest face of the truthful one, are alone seen by him. In short, one witness may give testimony that reads in print, here, as if falling from the lips of an angel of light, and yet not a soul who heard it, *nisi* believed a word of it; and another witness may understand that it reads brokenly and obscurely in print, and yet there was that about the witness that carried conviction of truth to every soul who heard him testify. Therefore, where an issue in equity rests on the credibility of witness, the upper court may with entire propriety rest somewhat on the superior advantage of the lower court in determining a fact.'

"As an example of pure, printed eloquence, playing like flashes of lightning among the words and thoughts expressed, we cite the above."

This quotation states the rule forcibly, and we recognize it at its full value. We constantly act upon this rule where it is applicable. But when there is testimony in the record, not improbable on its face, the chancellor should accept such evidence unless it is contradicted by other evidence. We think in the record before us this testimony is not contradicted as to what Halliburton & Moore agreed to do with reference to presenting the papers, the abstract of title, and the data obtained by Mr. Johnson, to Mr. Miller or his attorney. It was their duty to do this, having undertaken it, and having led Mrs. Crichton to rely upon their action in the matter. It was their duty not only to present the notes and deed of

trust and abstract of title with the data procured by Mr. Johnson, to Mr. Miller or his attorney, after undertaking to do so; but if they did so, and it was rejected, or further proceedings were required, it was their duty promptly to notify Mrs. Crichton of that fact.

This being true, it was their duty to make proof upon this point in the case, to overcome the testimony of Mr. Johnson upon this point, or to show compliance on their part with that agreement. Consequently, the chancellor was in error in construing the former opinion as holding that all matters occurring after the execution of the contract between Mrs. Crichton and Mr. Miller, and between Mrs. Crichton and Halliburton & Moore were immaterial or without consequence.

A party may not, in such case, mislead another to his hurt, and then recover from him. We do not think that the fact of the suit against Mr. Miller for specific performance being dismissed, under the facts stated, precluded the executor from defending this suit. The suit might possibly have been defended upon the ground that the abstract of title or proof of the merchantable title shown by the abstract or other evidence, that would satisfy a competent attorney, was presented within the time required under the contract. It may have been, if Halliburton & Moore had presented the data obtained by Mr. Johnson to perfect the title, or to attempt to do so, that it would have been accepted as satisfactory evidence of title, if presented within the sixty-day period, or prior to the death of Mrs. Crichton.

It may be that the rule prohibiting witnesses from testifying to establish their title or claim against the estate of the deceased person, has worked a hardship here. It frequently does that. But we cannot ignore the statute because of this fact.

It seems to us that if there had been prompt action by Halliburton & Moore immediately upon the 13th day of

August, the whole matter might have been carried through successfully prior to the death of Mrs. Crichton.

The opinion and judgment of the chancery court must be reversed, and the bill dismissed.

*Reversed and dismissed.*